UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re *Ex Parte* Application of SHAREEFAH KHALED ALGHANIM for an Order to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782.

Case No. 17 Misc. _____

---

### DECLARATION OF SHAREEFAH KHALED ALGHANIM IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

SHAREEFAH KHALED ALGHANIM declares, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. The facts set forth herein are based on my personal knowledge, unless otherwise indicated. I respectfully submit this Declaration in support of my application for discovery in aid of foreign proceedings under 28 U.S.C. § 1782. If called as a witness, I could and would testify to the same as stated herein.

*Background*

2. I am the company secretary, Vice-President, and a 50% shareholder of Future Media Architects, Inc. ("FMA"). My brother, Thunayan Khaled Alghanim ("Thunayan") is the sole director of FMA and holds the balance of FMA's shares.

3. FMA was incorporated as a British Virgin Islands international business company on March 31, 2003 and has been utilized ever since as a vehicle to hold internet domain names.

4. As FMA's sole director, Thunayan sought to make investments in internet domain names. Over time, FMA—under Thunayan's direction—amassed over 100,000 domain names, rendering it, at one point, among the world's largest holders of internet domain names.

5. The registration of internet domain names requires the payment of an annual registration fee to an internet domain name registrar.

6. There are many internet domain name registrars in the United States and the Cayman Islands. These registrars are for-profit corporations.

7. Internet domain name registrations fall due 12 months after the date of their original registration, and on that same date each year thereafter. For convenience, FMA historically made payments at the start of each month for fees due in that month. Registration fees range from $80,000 to $120,000 per month.

8. FMA's annual outlay for registration fees has been historically in the range of approximately $1.2 million.

9. The value of domain names can vary significantly, and can be difficult to assess, with some domain names holding significant value, and others relatively little.

10. The value of FMA's ownership of domain names was largely illiquid, generating only a fraction of the monies necessary to cover FMA's domain name registration fees. The book value of the domain names themselves, however, was considerable. DigitalDNA, an internet domain name brokerage firm, conducted a complementary valuation of FMA's domain name portfolio in 2012 as part of a marketing exercise. FMA's domain name portfolio was valued by DigitalDNA as of May 21, 2012 at $57,420,441.50. *See* Statement of Claim filed on November 8, 2013, at ¶ 7, a true and correct copy of which is attached hereto as Exhibit A.

11. In assessing the value of FMA's domain name portfolio in 2012, DigitalDNA determined "that 99% of the portfolio's value is driven by 43.8% of the domains. Further, DigitalDNA found that 90% of the portfolio's value was maintained by only 6.5% of domains." *See id.* In light of historical sales of FMA assets following DigitalDNA's valuation, it is my belief

that their 2012 estimate was highly conservative, and that the actual value of FMA's portfolio was significantly higher.

The Dispute over FMA's Domain Name Portfolio

12. FMA's registration fees were historically paid out of two joint accounts, each held in Thunayan's and my names (collectively, the "Joint Accounts"). Monies were paid into the Joint Accounts from various revenue streams generated from assets unrelated to FMA, and held jointly by Thunayan and me. Accordingly, FMA has been funded by Thunayan's and my joint monies for no less than ten years. FMA thus owes Thunayan and me collectively over $10 million for domain name registration fees paid by us on behalf of FMA.

13. Because the cost of registering and maintaining domain names is high, and the range of value of those domain names can vary so significantly, I have sought, since around 2012, to convince Thunayan to cause FMA to pay registration fees for only the more valuable sub-set of FMA's domain names, and to allow the majority of the low- or no-value domain names to fall away. Thunayan has never agreed with this approach, insisting instead on maintaining all of FMA's domain names.

14. Historically, the revenue stream from the Joint Accounts has been insufficient to fund the renewal fees for the totality of the domain names held by FMA. Since at least September of 2013, I alone have carried the burden of paying FMA's renewal fees. As a result of the extreme financial burden of personally funding FMA's renewal fees, I resolved, after having personally paid FMA's August and September 2013 renewal fees, that I could no longer borrow money for this purpose. My entreaties to Thunayan to accept that FMA could only afford to fund profitable domain names were ignored.

Thunayan's Inability to Properly Manage FMA

15. Although my dispute with Thunayan began as an ordinary business disagreement over how best to run FMA, matters have in the last few years taken a more serious turn. Beginning around 2013, it is my belief that my brother's judgment and ability to manage FMA has been progressively compromised as the result of a serious drug and alcohol problem. This is a problem that has been ongoing for some time, and has included institutionalized care for substance abuse following multiple instances of erratic and sometimes violent behavior. *See* Exhibit A, at ¶¶ 21-27.

16. Moreover, my brother's increasingly erratic behavior, coupled with his refusal to heed my warnings regarding FMA's finances, have put FMA's value as a going concern, and its continued ability to operate, at significant risk.

FMA Is Placed Into Receivership in BVI

17. As a result of Thunayan's drug addiction, his erratic behavior, and the immediate threat this posed to FMA's continued and future existence, I found myself forced to initiate litigation before the BVI Commercial Court seeking, *inter alia*, the appointment of a receiver over FMA's assets, with an instruction to continue to fund only a subset of FMA's domain names, specifically, those domain names that provided significant value for the company (the "BVI Proceedings"). *See* Notice of Application dated October 16, 2013, a true and correct copy of which is attached hereto as Exhibit B.

18. The Petition was granted by the BVI Commercial Court on September 17, 2013. *See* Order of the BVI Commercial Court granting application for an appointment of a receiver dated October 17, 2013 (the "Order"), a true and correct copy of which is attached hereto as Exhibit C. The order appointing a receiver over FMA's assets included a direction that the

receiver has the power to cause Thunayan to accept my loan monies for the purpose of preserving at least those domain names holding real value to FMA. *See id* at ¶ 2.

19. Following the appointment of a receiver by the BVI court, said receiver was authorized to renew the domain names held in FMA's portfolio. *Id.* Pursuant to the Order, all loan monies advanced by me to FMA for the renewal had to be repaid by the company. *Id.*

20. Since the date upon which a receiver over FMA's assets was appointed, Thunayan has refused to identify or value the assets held by FMA, hindering both my ability to value the company and, more importantly, my ability to ensure that the domain names of value held by FMA could be readily and timely renewed. *See* Letter dated December 3, 2013 from Campbells to Sabals Law regarding BVI Commercial Court Proceedings No. 132 of 2013, a true and correct copy of which is attached hereto as Exhibit D.

21. In an effort to save FMA, I hired at my own expense a team of people to assist me in identifying which FMA domain names provided real value to the company. I personally funded both this effort, which took a full year, and the renewal costs for those profitable domain names. I refused to fund the continued renewal of worthless domain names, which, in accordance with the Receiver's instructions, were allowed to lapse.

22. The culling of FMA's unprofitable domain names was done with the knowledge and approval of the BVI judge overseeing the receivership, Mr. Justice Bannister QC.

23. Over the course of the receivership proceedings, I have advanced FMA more than US$460,000, none of which has been repaid, despite my repeated requests and the order of the BVI Court directing that any such advances be considered loans to FMA.

Recent Developments

24. In 2014, my brother and I reached an agreement to hold the BVI Proceedings in abeyance while professional persons set about selling FMA assets. As part of that agreement, FMA agreed to open a BVI-based bank account to hold revenues generated from the sale of FMA assets.

25. In or around the spring of 2015, following a failed effort to open an account in BVI with Scotiabank, FMA, over my objections, opened an account with Citibank, N.A. for the purpose of depositing proceeds from the sale of FMA's domain names.

26. Since 2014, domain names sold by FMA have generated more than $24 million in revenue. I have received only a fraction of that amount (approximately $9 million) from FMA—in which I continue to be a 50% shareholder—and my loans have still not been repaid by the company. My BVI Counsel was receiving ad hoc sales reports up until 28 January 2016. It is my understanding that there have been no fewer than five instances in which domain names were sold by the company without notice to me.

27. The cessation of reporting by FMA's lawyers was accompanied by other erratic events, including the total absence of board of directors meetings (despite repeated promises that these would be held); and my brother's failure to make timely filings with the BVI Registrar of Companies, which I am informed could eventually result in FMA's being struck off BVI's corporate registry.

28. In addition, on February 3, 2017, my brother was detained by London's Metropolitan Police under the mental Health Act in the UK following a violent, drug-induced, breakdown. It is my belief that he is unfit to run FMA.

*Akin Gump*

29. On information and belief, Thunyan retained Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") to provide services to FMA. Among other things, Akin Gump provided *ad hoc* sales reports to my BVI counsel up to 28 January 2016.

30. With respect to Akin Gump, I intend to seek discovery relating to the work that Akin Gump has done for FMA: (1) the management of FMA Inc., FMA LLC, and related companies; (2) email communications relating to FMA Inc. and FMA LLC; (3) invoices (itemized) for FMA Inc., FMA LLC, and related companies; (4) the authorized signatories for all bank accounts held by FMA Inc. and FMA LLC, or related entities; (5) checks, bank transactions, credit/debit cards and statements for FMA Inc. and FMA LLC; (6) all expenses incurred by FMA which are not related to FMA Inc. and FMA LLC; and (7) invoices, emails and any related documents for FMA Inc. and FMA LLC or related companies for Adel Al-Ali.

31. On information and belief, the materials sought from Akin Gump can be found in its New York City offices.

*Prior § 1782 Application and the Discovery of WithumSmith and Santander*

32. I previously commenced an action, pursuant to 28 U.S.C. § 1782, to obtain documents from Citibank, N.A., in an attempt to obtain more information about the finances of FMA in aid of the pending BVI proceedings. That application was granted by the Southern District of Florida on May 2, 2017. A true and correct copy of the order granting my application is attached as Exhibit E.

33. Among other things, the documents produced from the Citibank subpoena show that the accounting firm WithumSmith+Brown, PC ("WithumSmith") has had a substantial role in facilitating the management of FMA's business. These activities include the direction of payments to and from various FMA accounts.

34. With respect to WithumSmith, I intend to seek discovery with respect to the services that WithumSmith provided to FMA: (1) email communication between WithumSmith, Thunayan, FMA Inc., FMA LLC, Akin Gump, and Adel Al-Ali; (2) payments for FMA Inc., FMA LLC, and Thunayan; (3) the identity of persons authorized to instruct WithumSmith to do financial transactions on behalf of FMA Inc., FMA LLC, and Thunayan; and (4) bank accounts, statements, and transactions for FMA LLC, FMA Inc., and Thunayan.

35. On information and belief, the documents sought from WithumSmith can be found in its New York City offices.

36. In addition, the documents produced from the Citibank subpoena show that FMA appears to have an account with Santander Bank, N.A. (the "Santander Account"). I am unaware of the status of the Santander Account, whether all or even some of the proceeds of the sale of FMA assets were transferred to the Santander Account, or if it even remains open. It is my further understanding that the proceeds of the Santander Account may have been transferred to Thunayan's personal accounts, among others.

37. With respect to Santander Bank, I intend to seek discovery relating to: (1) the opening of any Santander Bank account by FMA, Inc., FMA LLC and/or Thunayan; (2) authorized signatories to every Santander Bank account of FMA, Inc., FMA LLC and/or Thunayan; (3) incoming and outgoing wire transfers from the date of opening of all FMA, Inc., FMA LLC and/or Thunayan Santander Bank accounts to present; (4) account statements from the date of opening of all FMA, Inc., FMA LLC and/or Thunayan Santander Bank accounts to the present; (5) credit card and debit card holder details and statements from the opening of any FMA, Inc., FMA LLC and/or Thunayan Santander Bank accounts to the present; (6) cancelled checks from the opening of all FMA, Inc., FMA LLC and/or Thunayan Santander Bank accounts

to the present; and (7) account opening documents, account statements, cancelled checks, debit and credit card statements that have a joint account with any or a combination of the entities FMA, Inc., FMA LLC and/or Thunayan.

38. On information and belief, the materials sought from Santander Bank can be found in their New York City offices.

*Attempts to Obtain Documents from Akin Gump and WithumSmith on Consent*

39. In an effort to obtain documents without need for judicial intervention, my attorneys wrote to Akin Gump and WithumSmith and requested that they produce materials to me on consent, as the 50% shareholder of FMA. True and correct copies of those letters are attached hereto as Exhibit F.

40. WithumSmith has indicated that they will not provide any documents to me without a subpoena, "notwithstanding [my counsel's] representation that … [I am] an owner of Future Media Architects, Inc." A true and correct copy of WithumSmith's letter to my attorneys is attached hereto as Exhibit G.

41. As of this writing, Akin Gump has not agreed to produce materials to me without a subpoena.

Dated: 20-10, 2017.

_____
Shareefah KhaledAlghanim