UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re *Ex Parte* Application of SHAREEFAH KHALED ALGHANIM for an Order to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782.

Case No. 17 Misc. _____

**MEMORANDUM OF LAW IN SUPPORT OF SHAREEFAH KHALED ALGHANIM'S APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

Petitioner, Shareefah Khaled Alghanim, respectfully submits this memorandum of law in support of her *ex parte* application for an Order, pursuant to 28 U.S.C. § 1782, to conduct discovery for use in a foreign proceeding.

**PRELIMINARY STATEMENT**

Petitioner seeks discovery pursuant to 28 U.S.C. § 1782 in aid of a proceeding pending in the British Virgin Islands ("BVI Proceeding"). Petitioner and her brother, Thunayan Khaled Alghanim ("Thunayan"), are each 50% shareholders of Future Media Architects ("FMA"), a BVI-based internet domain name holding company. In 2013, due to her brother's mismanagement of the company, Petitioner initiated litigation before the BVI Commercial Court and sought an order seeking, *inter alia*, the appointment of a receiver to protect FMA's assets. Following the initiation of the BVI Proceeding, Petitioner and her brother eventually agreed to the sale of a portion of those assets. Over Petitioner's objections, her brother opened an account with Citibank N.A. in the United States for the purpose of depositing the proceeds from those sales.

The sale of a small proportion of FMA's assets generated more than $24 million in revenue, which Petitioner believes were to be deposited into the Citibank account. Notwithstanding her 50% interest in the company (and substantial amounts due to her from

outstanding loans she made to FMA), Petitioner has to date received only a fraction of that amount (approximately $9 million), and has never received a proper accounting of the amounts held in the Citibank account.

Petitioner previously filed a section 1782 petition in the Southern District of Florida and obtained documents concerning the Citibank account. The Citibank documents revealed that the accounting firm WithumSmith+Brown, PC ("WithumSmith") had a substantial role in facilitating the management of FMA's business and that FMA appears to have a separate bank account with Santander Bank, N.A.

Accordingly, Petitioner now seeks information from Santander Bank and Withum Smith. Petitioner also seeks documents from Akin Gump, which was retained by FMA and which provided *ad hoc* sales reports to Petitioner's BVI counsel up to 28 January 2016, but has now refused to provide her with records without a subpoena. The documents sought are expected to shed light on the accounts and transactions undertaken for the benefit of FMA.

Petitioner seeks discovery from these entities in aid of the BVI Proceeding, which remains pending, in order to determine the quantum and locus of the funds deriving from the sale of FMA assets so that she may take the necessary steps to trace and recover the amounts properly due to her. The Southern District of Florida has already granted a similar application for Petitioner to obtain documents from Citibank, N.A. This application should be granted for substantially the same reasons.

## BACKGROUND

Petitioner is the secretary, Vice-President and a 50% shareholder of Future Media Architects, Inc. ("FMA"). *See* Declaration of Shareefah Khaled Alghanim dated October 20, 2017 at ¶ 2 (hereafter, the "Alghanim Decl."). Thunayan is the sole director of FMA and holds

the balance of FMA's shares. *Id.* FMA was incorporated as a British Virgin Islands international business company on March 31, 2003 and has been utilized ever since as a vehicle to hold internet domain names. *Id.* at ¶ 3. As FMA's sole director, Thunayan sought to make investments in internet domain names. *Id.* at ¶ 4. Over time, FMA—under Thunayan's direction—amassed over 100,000 domain names, rendering it, at one point, among the world's largest holders of internet domain names. *Id.*

The registration of internet domain names requires the payment of an annual registration fee to an internet domain name registrar. *Id.* at ¶ 5. There are many internet domain name registrars in the United States and the Cayman Islands. *Id.* at ¶ 6. These registrars are for-profit corporations. *Id.* Internet domain name registrations fall due 12 months after the date of their original registration, and on that same date each year thereafter. *Id.* at ¶ 7. For convenience, FMA historically made payments at the start of each month for fees due in that month. *Id.* Registration fees range from $80,000 to $120,000 per month. *Id.* FMA's annual outlay for registration fees has been historically in the range of approximately $1.2 million. *Id.* ¶ at 8.

The value of domain names can vary significantly, and can be difficult to assess, with some domain names holding significant value, and others relatively little. *Id.* at ¶ 9. The value of FMA's ownership of domain names was largely illiquid, generating only a fraction of the monies necessary to cover FMA's domain name registration fees. *Id.* at ¶ 10. The book value of the domain names themselves, however, was considerable. *Id.* DigitalDNA, an internet domain name brokerage firm, conducted a complementary valuation of FMA's domain name portfolio in 2012 as part of a marketing exercise. *Id.* FMA's domain name portfolio was valued by DigitalDNA as of May 21, 2012 at $57,420,441.50. *Id.* In assessing the value of FMA's domain name portfolio in 2012, DigitalDNA determined "that 99% of the portfolio's value is driven by 43.8% of the

domains. *Id.* at ¶ 11. Further, DigitalDNA found that 90% of the portfolio's value was maintained by only 6.5% of domains." *Id.* In light of historical sales of FMA assets following DigitalDNA's valuation, Petitioner believes that their 2012 estimate was highly conservative, and that the actual value of FMA's portfolio was significantly higher. *Id.*

### *The Dispute Over FMA's Domain Name Portfolio*

FMA's registration fees were historically paid out of two joint accounts, each held in Thunayan's and Petitioner's names (collectively, the "Joint Accounts"). *Id.* at ¶ 12. Monies were paid into the Joint Accounts from various revenue streams generated from assets unrelated to FMA, and held jointly by Thunayan and Petitioner. *Id.* Accordingly, FMA has been funded by Thunayan's and Petitioner's joint monies for no less than ten years. *Id.* FMA thus owes Thunayan and Petitioner collectively over $10 million for domain name registration fees paid by them on behalf of FMA. *Id.*

Because the cost of registering and maintaining domain names is high, and the range of value of those domain names can vary so significantly, Petitioner has sought, since around 2012, to convince Thunayan to cause FMA to pay registration fees for only the more valuable sub-set of FMA's domain names, and to allow the majority of the low- or no-value domain names to fall away. *Id.* at ¶ 13. Thunayan has never agreed with this approach, insisting instead on maintaining all of FMA's domain names. *Id.*

Historically, the revenue stream from the Joint Accounts has been insufficient to fund the renewal fees for the totality of the domain names held by FMA. *Id.* at ¶ 14. Since at least September of 2013, Petitioner alone has carried the burden of paying FMA's renewal fees. *Id.* As a result of the extreme financial burden of personally funding FMA's renewal fees, Petitioner resolved, after having personally paid FMA's August and September 2013 renewal fees, that she

could no longer borrow money for this purpose. *Id.* Her entreaties to Thunayan to accept that FMA could only afford to fund profitable domain names were ignored. *Id.*

### *Thunayan's Inability to Properly Manage FMA*

Although Petitioner's dispute with Thunayan began as an ordinary business disagreement over how best to run FMA, matters have in the last few years taken a more serious turn. *Id.* at ¶ 15. Petitioner believes that beginning around 2013, Thunayan's judgment and ability to manage FMA has been progressively compromised as the result of a serious drug and alcohol problem. *Id.* This is a problem that has been ongoing for some time, and has included institutionalized care for substance abuse following multiple instances of erratic and sometimes violent behavior. *Id.*. Thunayan's increasingly erratic behavior, coupled with his refusal to heed Petitioner's warnings regarding FMA's finances, have put FMA's value as a going concern, and its continued ability to operate, at significant risk. *Id.* at ¶ 16.

### *FMA Is Placed Into Receivership in BVI*

As a result of Thunayan's drug addiction, his erratic behavior, and the immediate threat this posed to FMA's continued and future existence, Petitioner was forced to initiate litigation before the BVI Commercial Court seeking, *inter alia*, the appointment of a receiver over FMA's assets, with an instruction to continue to fund only a subset of FMA's domain names, specifically, those domain names that provided significant value for the company (the "BVI Proceedings"). *Id.* at ¶ 17. The petition was granted by the BVI Commercial Court on September 17, 2013. *Id*. at ¶ 18. The order appointing a receiver over FMA's assets (the "Order") included a direction that the receiver must accept Petitioner's loan monies for the purpose of preserving at least those domain names holding real value to FMA. *Id.* & Ex. C (Order).

Following the appointment of a receiver by the BVI court, said receiver was authorized to renew the domain names held in FMA's portfolio. *Id.* at ¶ 19. Pursuant to the Order, all monies advanced by Petitioner to FMA for the renewal of domain name registrations had to be be repaid by the company. *Id.*

Since the date upon which a receiver over FMA's assets was appointed, Thunayan has refused to identify or value the assets held by FMA, hindering both Petitioner's ability to value the company and, more importantly, Petitioner's ability to ensure that the domain names of value held by FMA could be readily and timely renewed. *Id.* at ¶ 20 & Ex. D.

In an effort to save FMA, Petitioner hired at her own expense a team of people to assist in identifying which FMA domain names provided real value to the company. *Id.* at ¶ 21. Petitioner personally funded both this effort, which took a full year, and the renewal costs for those profitable domain names. *Id.* Petitioner refused to fund the continued renewal of worthless domain names, which, in accordance with the Receiver's instructions, were allowed to lapse. *Id.*

The culling of FMA's unprofitable domain names was done with the knowledge and approval of the BVI judge overseeing the receivership, Mr. Justice Bannister QC. *Id.* at ¶ 22. Over the course of the receivership proceedings, Petitioner advanced FMA more than US$460,000, none of which has been repaid, despite Petitioner's repeated requests and the order of the BVI Court directing that any such advances be considered loans to FMA. *Id.* at ¶ 23.

### *Recent Developments*

In 2014, Thunayan and Petitioner reached an agreement to hold the BVI Proceedings in abeyance while professional persons set about selling FMA assets. *Id.* at ¶ 24. As part of that agreement, FMA agreed to open a BVI-based bank account to hold revenues generated from the sale of FMA assets. *Id.* In or around the spring of 2015, following a failed effort to open an

account in BVI with Scotiabank, FMA, over Petitioner's objections, opened an account with Citibank N.A. for the purpose of depositing proceeds from the sale of FMA's domain names. *Id.* at ¶ 25.

Since 2014, domain names sold by FMA have generated more than $24 million in revenue. *Id.* at ¶ 26. Petitioner, however, received only a fraction of that amount (approximately $9 million) from FMA—in which she continues to be a 50% shareholder—and Petitioner's loans have still not been repaid by the company. *Id.* Petitioner's BVI Counsel was receiving *ad hoc* sales reports up until 28 January 2016 from FMA's lawyers at Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"). *Id.* at ¶¶ 26 & 29. It is Petitioner's belief that there have been no fewer than five instances in which domain names were sold by the company without notice to Petitioner. *Id.* at ¶ 26.

The cessation of reporting by FMA's lawyers was accompanied by other erratic events, including the  the total absence of board of directors meetings (despite repeated promises that these would be held) and Thunayan's failure to make timely filings with the BVI Registrar of Companies, which could eventually result in FMA being struck off BVI's corporate registry. *Id.* at ¶ 27.

In addition, on February 3, 2017, Thunayan was detained by London's Metropolitan Police under the mental Health Act in the UK following a violent, drug-induced, breakdown. *Id.* at ¶ 28. Petitioner believes that Thunayan is unfit to run FMA.

### *Previous Section 1782 Application, WithumSmith, and Santander Bank*

Petitioner previously commenced an action, pursuant to 28 U.S.C. § 1782, to obtain documents from Citibank, N.A., in an attempt to obtain more information about the finances of

FMA in aid of the BVI proceedings. *Id.* at ¶ 32. That application was granted by the Southern District of Florida on May 2, 2017. *Id.* & Ex E.

Among other things, the documents produced from the Citibank subpoena show that WithumSmith+Brown, PC ("WithumSmith") has had a substantial role in facilitating the management of FMA's business. *Id.* at ¶ 33. These activities include the direction of payments to and from various FMA accounts. *Id.*

In addition, the documents produced from the Citibank subpoena show that FMA appears to have an account with Santander Bank, N.A. (the "Santander Account"). *Id.* at ¶ 36. Petitioner is unaware of the status of the Santander Account, whether all or even some of the proceeds of the sale of FMA assets were transferred to the Santander Account, or if it even remains open. *Id.* Petitioner believes that the proceeds of the Santander Account may have been transferred to Thunayan's personal accounts, among others. *Id.*

In an effort to obtain documents without need for judicial intervention, Petitioner approached Akin Gump and WithumSmith and requested that they produce materials on consent, as Petitioner is the 50% shareholder of FMA. *Id.* ¶ at 39 &, Ex. F. WithumSmith has indicated that they will not provide any documents to me without a subpoena, "notwithstanding [my counsel's] representation that … [Petitioner is] an owner of Future Media Architects, Inc." *Id.* at ¶ 40 & Ex. G. As of this writing, Akin Gump has not agreed to produce materials without a subpoena. *Id.* at ¶ 41.

As a result, Petitioner now brings this application for subpoenas to obtain financial information concerning FMA from Santander Bank, WithumSmith, and Akin Gump.

**ARGUMENT**

Section 1782 of Title 28 of the United States Code permits the United States District Court to grant discovery for use in a foreign proceeding. The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782. "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Glock v. Glock, Inc.*, 797 F.3d 1002, 1007 (11th Cir. 2015) (*citing Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004)). "The current embodiment of the law reflects the policy choice to provide efficient means of assistance in our federal courts for litigants involved in international litigation and prompt foreign courts to follow our generous example and provide similar assistance to our court systems." *Id.* (internal alterations and quotations marks omitted).

When a court finds that the statutory requirements of 28 U.S.C. § 1782 are met, it may, in its discretion, grant an application for discovery. The United States Supreme Court has articulated a number of factors the district courts should consider when weighing an application under Section 1782. As set forth in greater detail below, all these discretionary factors weigh in favor of granting Petitioner the requested discovery.

**I.    PETITIONER SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782.**

Courts are authorized to grant an application made pursuant to 28 U.S.C. §1782 where "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any

interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012). Petitioner's application satisfies all three statutory requirements.

First, each of the entities from which documents are sought is found in this district. Santander Bank, N.A. has offices at 45 East 53rd Street, New York, NY 10022; WithumSmith has offices at 1411 Broadway, 9th Floor, New York, NY 10018; and Akin Gump has offices at Bank of America Tower, 1 Bryant Park, New York, NY 10036. Petitioner seeks records that should be held by these entities in the ordinary course of business, and which it should easily be able to produce in this District.

Second, the discovery sought is for use in a foreign proceeding—the BVI Proceedings initiated by Petitioner. Alghanim Decl. at ¶¶ 30, 34, 37. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004).

Third, Petitioner is an "interested person" authorized to bring this application because she initiated the BVI Proceedings on behalf of a company where she serves as the company Secretary, Vice-President, and as a 50% shareholder. Alghanim Decl. at ¶ 2. In addition, as the individual who commenced the BVI Proceeding as a means of protecting the assets of a company in which she holds a 50 percent stake, Petitioner is clearly and "interested person" in the outcome of that action. *Intel Corp.*, 542 U.S. at 256. As the individual who initiated the BVI Proceeding, Petitioner has the right to participate in that proceeding by presenting evidence. The U.S. Supreme Court has identified significant "participation rights" and the existence of "a reasonable interest in obtaining judicial assistance" as factors establishing a party as an "interested person." *Id.* These factors are clearly satisfied here.

Each of the requisite statutory elements necessary to permit this Court to order discovery under 28 U.S.C. § 1782 is satisfied. *See also In re* Ex Parte *Application of Shareefah Khalid*

*Alghanim,* No. 17-mc-21611 (S.D.F. May 2, 2017) (Petitioner's previously successful application for issuance of a subpoena in aid of the BVI proceedings).

## II. THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT PETITIONER THE REQUESTED DISCOVERY ORDER.

"Once the statutory requirements [of 28 U.S.C. § 1782] are met, a district court is free to grant discovery in its discretion." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004) (internal quotation marks and alterations omitted). The Supreme Court has identified a number of factors that the district courts are to consider in ruling on a section 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign court to federal court assistance; (3) whether the application conceals an attempt to circumvent foreign proof gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel Corp.*, 542 U.S. at 264-65; *Brandi-Dohrn*, 673 F.3d at 80-81. Here, all of the factors weigh in favor of granting Petitioner's application.

First, where, as here, discovery is sought from an entity that is not participating in the foreign proceeding, the need for court-ordered discovery is apparent. As the Supreme Court explained, "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent §1782(a) aid." *Intel Corp.*, 542 U.S. at 264 (internal citations omitted).

The second factor identified by the Supreme Court—the nature of the foreign proceedings and the receptivity of the foreign tribunal to federal court assistance—requires

courts to consider: "(1) whether the United States assistance would offend the foreign country, and (2) whether the material sought is admissible in the foreign tribunal." *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf* No. M 19-99, 2006 WL 3844464, at *6 (S.D.N.Y Dec. 29, 206). In weighing these elements, courts may only rely on "authoritative proof." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995). Here, there is no evidence that the discovery sought in this application would "offend" the BVI. Nor is there any indication that the documents sought would be inadmissible in the BVI. To the contrary, the discovery requested consists of ordinary business records held by the subject entities in the ordinary course of business. In particular, given the strong interest the BVI courts have in protecting the interests of BVI companies and their investors, Petitioner has reason to believe that the discovery sought would be welcomed by that court. This factor thus weights in favor of granting Petitioner's application.

The third factor also suggests that discovery should be granted, as this application is not an attempt to circumvent any foreign proof-gathering restrictions. "[T]he burden is on the opponent of a §1782 request to prove that the foreign court would reject the evidence obtained through §1782." *In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24, 2014); *Euromep S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995) ("[W]e believe that a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782."). The discovery sought in this application does not, to Petitioner's knowledge, violate any restrictions under BVI law on evidence gathering.

Finally, this application is not burdensome. These kinds of accounting and bank records are routinely sought and produced via section1782 petitions. *See, e.g., In re Application of*

*Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL 8775453, at *5 (S.D.N.Y. Dec. 24, 2014) (ordering production of bank records, including wire transfers, pursuant to section1782); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Intern. (USA) Ltd.*, 785 F. Supp. 2d 434, 437 (S.D.N.Y. 2011) (granting section1782 petition seeking disclosure of account statements, account opening materials, customer files, and due diligence materials).

### III.  THE COURT SHOULD GRANT PETITIONER'S APPLICATION *EX PARTE*.

The Court should grant Petitioner's application *ex parte*. The courts in this district routinely do so. As noted by Judge Kaplan:

> Applications pursuant to 28 U.S.C. §1782 are frequently granted ex parte. Where, as here, the application is for the issuance of subpoenas, no substantial rights of the subpoenaed person are implicated by such action, as the subpoenaed person, once served, is entitled to move to quash or modify the subpoenas.

*In re Chevron Corp.*, No. 10-mc-00002 (LAK) (S.D.N.Y. Aug. 6, 2010) (order granting application for ex parte order for discovery under 28 U.S.C. § 1782).

In this case, Santander Bank, WithumSmith, and Akin Gump will not be prejudiced by granting Petitioner's application for subpoenas ex parte as each will have an opportunity to challenge the discovery Petitioner is seeking once it is served with a subpoena.

### CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the Application for Order to conduct Discovery in a Foreign Proceeding *Ex Parte*; (b) enter the Proposed Order attached to the Application as Exhibit "A," (c) grant Petitioner leave, pursuant to

28 U.S.C. § 1782, to serve the subpoenas attached to the Application as Composite Exhibit "B";

and (d) grant any and all other relief to Petitioner as deemed just and proper.

Dated: October 23, 2017
      New York, New York

                                     EMERY CELLI BRINCKERHOFF
                                     & ABADY LLP

                                     By: _____/s_____
                                           O. Andrew F. Wilson
                                           600 Fifth Avenue, 10th Floor
                                           New York, NY 10020
                                           (212) 763-5000

                                     *Attorneys for Plaintiff*