```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SHAREEFAH KHALID ALGHANIM,

 4                  Petitioner,

 5           v.                              17 MC 406 (PKC)

 6   SANTANDER BANK, N.A., et al.,

 7                  Respondents.

 8   ------------------------------x
                                            New York, N.Y.
 9                                          May 1, 2018
                                            3:00 p.m.
10
     Before:
11
                        HON. P. KEVIN CASTEL,
12
                                            District Judge
13
                            APPEARANCES
14
     EMERY CELLI BRINCKERHOFF & ABADY, LLP
15        Attorneys for Petitioner
     BY:  O. ANDREW F. WILSON
16        ASHOK CHANDRAN

17   LANKLER SIFFERT & WOHL LLP
          Attorneys for Respondent
18   BY:  FRANK H. WOHL
          BEN ARAD
19

20

21

22

23

24

25
```

```
 1                (Case called)

 2                THE DEPUTY CLERK:  For the petitioner.

 3                MR. WILSON:  Good afternoon, your Honor.  My name is

 4    Andrew Wilson of the law firm Emery Celli Brinckerhoff & Abady,

 5    and I'm here this afternoon with my colleague, Ashok Chandran.

 6                THE COURT:  Good afternoon to you, both.

 7                For the respondent.

 8                MR. WOHL:  Good afternoon, your Honor.  Frank Wohl

 9    from the law firm of Lankler Siffert & Wohl.  With me is my

10    associate Ben Arad and our paralegal Eugenie Dubin.

11                THE COURT:  Good afternoon.  Nice to see you,

12    Mr. Wohl, and good afternoon, everyone.

13                It seems to me that everyone did a good job on the

14    briefing, and the issues are now, as far as I can tell,

15    narrowed down as to whether or not the discovery meets the

16    requirement of "for use" in a foreign proceeding, including

17    under the reasonably contemplated test.

18                And then under the *Intel* factors, there is a question

19    of whether the respondent is a de facto party to the foreign

20    proceeding, whether the discovery is really sought against a

21    party, not that that's dispositive of anything, but it is a

22    factor to be considered under *Intel*.  And then finally, whether

23    it's unduly intrusive or burdensome.

24                So let me give the applicant the first opportunity to

25    speak.
```

1          MR. WILSON:  Thank you, your Honor.

2          I'll organize my remarks along the three questions

3     that you have identified.

4          THE COURT:  Are those the right three questions?

5          MR. WILSON:  They are the exact three questions that I

6     had prepared, your Honor.

7          THE COURT:  Okay.

8          MR. WILSON:  The first looks at the one statutory

9     prong that's contested, and that is whether or not the material

10    is being sought for use in a foreign proceeding.

11         I think before diving into the legal analysis, it

12    might be helpful to lay out just a brief timeline that orients

13    us as to what's been going on in the British Virgin Islands

14    proceeding.

15         Basically back in 2012, Thunayan Alghanim, who is the

16    brother of the applicant here, Shareefah Alghanim, retained

17    Akin Gump to be an attorney for the company that these two

18    siblings owned together called FMA, Future Media Architects.

19         At that time, Thunayan, as he remains, was the

20    managing member of this company.  About a year after he

21    retained Akin Gump, Shareefah commenced proceedings in the

22    British Virgin Islands on the grounds that her brother was

23    behaving erratically and that he was not conducting the affairs

24    of the company in accordance with the best interests of the

25    company.  This, as your Honor will have read in the papers, is

 1   a company that owns, buys, and sells domain names.

 2          After commencing the litigation in 2013, in 2014, in

 3   about a year, the parties agreed to hold that litigation in

 4   abeyance while they worked out amongst themselves whether they

 5   could work through the issues that they were having in the

 6   company.

 7          I think it's notable that between 2014 and today, to

 8   give your Honor a sense of the volume of transactions, FMA has

 9   sold approximately $24 million in domain names, and the issue

10   that has arisen is that of that $24 million, only $9 million of

11   the assets have been accounted for.

12          So through a combination of ongoing concerns about

13   Thunayan's behavior -- it's in the record that he has struggled

14   with drug addiction problems -- and in addition the concern

15   about where this money has gone, Shareefah, in 2017 began

16   seeking 1782 discovery to ascertain the location of the assets

17   and the status of the FMA.

18          THE COURT:  This was the proceeding in the Southern

19   District of Florida resulting in the subpoena on Citigroup

20   which Citigroup complied with which brings us where we are

21   today.

22          MR. WILSON:  Exactly, your Honor.

23          So when we step back and ask the question whether or

24   not the 1782 that's before you to take documents from Akin Gump

25   is for use in the BVI proceedings, I think there are really two

1    questions, two ways to look at that:  One is are those

2    proceedings amenable to receive document discovery right now.

3    Are they open.  Are they ongoing.

4            The issue that Akin has raised is that those

5    proceedings are not active.  Basically since 2015 when the

6    receiver resigned, there hasn't been much, if any, activity in

7    that litigation.

8            Our argument is that whether the litigation is active

9    or not is not the standard.  The question is whether the

10   proceedings exist, whether they're open.  It's common ground --

11           THE COURT:  Let's assume for the moment that they're

12   not open.  If they're not open but they're reasonably

13   contemplated, the provision is satisfied.  Correct?

14           MR. WILSON:  Yes, your Honor.

15           THE COURT:  What's the significance of the proceeding

16   being open, other than a fact that a court can take account of

17   in deciding whether it's for use?

18           MR. WILSON:  Your Honor, it's a vestige of our

19   briefing in this case in that when we initially moved ex parte

20   to obtain the right to serve the subpoena, we presented the

21   Court with a declaration from Shareefah which identified these

22   proceedings as being open, and those proceedings are the ones

23   that she expects to make a further application to get further

24   relief.  So that was the hook, if you will, for purposes of

25   obtaining the subpoena.

1         To the extent that we're now in a position where there

2    are questions about the viability of those proceedings, I

3    certainly can answer those.  But your Honor is correct.  We

4    don't need to satisfy that prong using the BVI proceedings.

5    The fact that Shareefah is actively preparing materials to seek

6    further relief satisfies the reasonably contemplated test.

7         THE COURT:  One of the statements that was made in the

8    original application to the issuance of the subpoena in this

9    district was that your client is making a showing that she

10   seeks the information to "trace and recover assets" due to her

11   from the sale of FMA assets, a process undertaken with the

12   knowledge and approval of the BVI court.  That's the

13   application at paragraph 2.

14        What's the basis for that statement?

15        MR. WILSON:  That statement refers to the process that

16   began in 2013 when a receiver was appointed.  The receiver has

17   now resigned as of 2015, but what's happened is that in 2014,

18   before the receiver resigned, the parties were engaged in that

19   exact process and were effectively working together.

20        That has broken down, and so this is the continuation

21   of that process.  I think that -- so that's the reference.

22        THE COURT:  But that is a bit conflated there.  It

23   sounds a bit to me like you're sitting across a negotiating

24   table and you're saying, well, show me where the assets went.

25        And a person says, fine.  I'll do that.  And a court

1    is generally aware that the parties are engaging in some sort

2    of settlement process and is very happy that they're doing it,

3    approves of it in that sense.  But that's quite different in

4    kind and character from a judicial proceeding to accomplish

5    that result.

6              MR. WILSON:  You're right, your Honor.  To the extent

7    that the declaration as drafted gives the Court the impression

8    that there is ongoing court oversight to this process, then

9    that overstates the process.

10             What we have is effectively the continuation of this

11   process without direct relationship with the court.  This is a

12   position where after obtaining the documents and analyzing

13   them, the expectation is to go back under that same index

14   number and seek further relief.

15             THE COURT:  All right.

16             MR. WILSON:  In closing with respect to that prong,

17   your Honor has already invoked this test, but under *Mees v.*

18   *Buiter* and even under *Intel* itself, courts in the United States

19   recognize that individual applicants can obtain documents for

20   use in proceedings that are anticipated, and I think that is

21   the most accurate way to describe what we have here in

22   Ms. Alghanim's application.

23             Turning to Akin Gump as a source for these documents

24   and whether or not under the discretionary factors the law firm

25   is a de facto party and, therefore, that status would militate

1    against production, I think the core inquiry here is whether or

2    not the foreign tribunal has the ability, the control, to

3    obtain these documents or not.

4           It's a substantive inquiry as to whether or not these

5    materials are available in the forum proceeding, not a

6    categorical one, whether a law firm of a party is amenable to

7    this kind of discovery.

8           I think the best way to understand this distinction is

9    to compare two cases that were cited in Akin Gump's papers,

10   both involving the law firm of Cravath Swain & Moore.  The

11   first is from the Second Circuit in 2003 which is the *Schmitz*

12   *v. Bernstein* case, and the second case is *In re Kiobel*, which

13   is a case from Judge Hellerstein in 2017.

14          In the *Schmitz* case Cravath succeeded in effectively

15   quashing a 1782 subpoena using this argument, that in effect,

16   Deutsche Telekom, their client in the German proceedings, could

17   provide the documents as readily as they could:

18          I think there are two aspects that are significant

19   about that case.  One is that the German authorities in that

20   case had specifically requested that the federal courts in the

21   United States not provide the discovery because to do so would

22   interfere with an ongoing criminal investigation.  So the core

23   holding in the case focuses on the extent to which discovery

24   would be antithetical to the comedy concerns that really

25   animate 1782.

1          The court also did note that because DT was a party in

2    the foreign proceedings, that presumptively the need for the

3    documents was lower because the court presumed you could obtain

4    them from DT.

5          Then I think it's instructive to then compare that

6    against *In re Kiobel* where Cravath, 14 years later, cites the

7    same case in furtherance of the same argument.  In that case,

8    there involved discovery that related to Shell Corporation in a

9    Nigerian action.  The court there noted that the focus of the

10   subpoena is on the need for the documents and "the foreign

11   tribunal's ability to control the evidence."

12         The court awarded discovery against Cravath in that

13   case really for two reasons:  One was legal, and one was

14   practical.  The legal reason was that in that case the

15   complaint had not yet been filed.

16         So we had a situation where the applicant did not have

17   access to the discovery vehicle in the foreign jurisdiction

18   because they were trying to prepare a complaint to make a

19   sufficient showing to make their application to the court.  So

20   as a legal matter, discovery wasn't available to the applicant.

21         As a practical matter, the court noted that the

22   documents that were being sought, which were deposition

23   transcripts -- it wasn't readily apparent that Shell would have

24   them themselves and that the law firm was most likely to

25   possess the physical documents.

1          Turning to our case, in terms of the legal analysis,

2     because as we've just discussed, the proceedings in the BVI are

3     in a state of inactivity.  There is no immediate availability

4     of discovery in that process.

5          Akin has pointed out that Ms. Alghanim could go into

6     the BVI courts and initiate applications for discovery, etc.

7     But as we stand here today, they're not in an active discovery

8     process.  So I think it's more analogous to *Kiobel* in that

9     respect.

10         More profoundly though are the practical concerns.  If

11    we turn back to the timeline I gave before, Akin Gump has been

12    a key player in helping to manage the affairs of FMA for a

13    four-year period, from 2012 to 2016.

14         And we're now in a situation where the principal, who

15    had retained Akin who is the partner, Thunayan Alghanim, is

16    effectively out of touch with all parties.

17         THE COURT:  Is Thunayan a party to the BVI proceeding?

18         MR. WILSON:  Well, your Honor, I don't know how to

19    answer that definitively.  I know that FMA was represented by

20    counsel that was retained effectively by Akin Gump in those

21    proceedings as local counsel and that it was an adversary

22    proceeding where Shareefah was represented by one firm and

23    effectively Thunayan was controlling the other attorneys.  I

24    don't know whether it was in his personal capacity or corporate

25    capacity.

1          THE COURT:  What's his status with respect to the

2     corporate entity, FMA?

3          MR. WILSON:  He continues to be a 50 percent

4     shareholder and the managing member of FMA.  The problem is

5     that he is in communicado, and we have that in the record

6     before your Honor because Akin Gump has tried -- I believe the

7     count is 13 times -- to get in touch with him through all

8     manner of communication, including attempts to personally

9     communicate with him, without success.

10         Unfortunately, this is a situation where the principal

11    appears to be embroiled in substance abuse problems and other

12    issues which make him unavailable.  I think that

13    unavailability, which we have in the record, is one of the

14    principal reasons that we need to obtain the documents from his

15    counsel.

16         I think also one can infer that unlike a situation

17    where you have Deutsche Telekom, a corporate entity that may

18    house a variety of documents that the *Schmitz* court would be

19    available in the forum proceeding, here we have an individual.

20    And in effect, he has been running FMA through a series of

21    advisers that include the accounting firm that we have a 1782

22    from who were getting documents from the bank and his lawyers,

23    Akin Gump.

24         THE COURT:  Does FMA have a board of directors?

25         MR. WILSON:  No.  My understanding is that FMA is

1   effectively Thunayan Allergan.  And his sister, as the record

2   shows, has provided some capital from time to time as necessary

3   to maintain the payment of the renewal licenses.

4            So I think, from our perspective, the reason that we

5   need to get the materials from Akin Gump is because there is no

6   practical alternative, both as a matter of fact in that it's

7   unlikely that Thunayan himself has these documents.  If he has

8   some of them, he certainly does not have all of the 7,000 that

9   Akin Gump says are potentially responsive.

10            Secondly, as we sit here today, there is not an active

11   discovery process in the BVI which would naturally be

12   available, which certainly it could be undertaken, but our

13   reading of the cases under 1782 is that that's not a

14   requirement, to have a local exhaustion of remedies, before we

15   seek the material here.

16            So the final question --

17            THE COURT:  What distinguishes your application from

18   just a more generalized fishing expedition just to see what

19   there is in the bank records, whether there is something

20   unusual?

21            What's the difference between looking for a claim and

22   looking for support for a claim?  And does that make a

23   difference where there is not a proceeding, effectively there

24   is not a proceeding alive and well at the moment and you're

25   arguing that one is reasonably contemplated?

1          MR. WILSON:  Well, your Honor, we've seen what this

2     proceeding looks like because it was effectively commenced with

3     the receiver back in 2013, and effectively what is contemplated

4     is a continuation of that process.

5          THE COURT:  You're going to have to educate me, but

6     with the receiver, I would think the receiver is the active

7     pursuer of information, not the party who sought the

8     appointment of the receiver.

9          Once the court says, that sounds like a great idea.

10     I'm going to appoint a receiver, then the party who sought the

11     appointment of the receiver steps aside in favor of the

12     receiver who is then the principal actor.  No?

13          MR. WILSON:  You're absolutely right, your Honor.  But

14     I wasn't meaning to say that Shareefah would be seeking the

15     appointment of a receiver again.  What I meant was in terms of

16     understanding the nature of the claim and whether this is like

17     an inchoate fishing expedition or something more specific, what

18     I meant to say is that what has already happened in this case

19     is that when the assets of the company have not been adequately

20     managed, i.e., that the registration payments have not been

21     made, Shareefah has stepped in to seek court efforts to prune

22     the inventory and pay for those assets that need to be

23     maintained in the service of protecting assets of the

24     corporation.

25          I think the two forms of relief that have been spoken

1    to to one degree or another in the papers are the need for

2    control of FMA on the one hand and, secondly, the need to trace

3    assets or effectively have an accounting of the corporation.

4         This is not a very complicated corporation in terms of

5    its business.  It buys and sells one asset, which is domain

6    names.  We know that there is an inventory of those names.  So

7    we're not seeking a claim.  I think the claim is quite precise.

8    It's that assets have been sold, and they have been divided

9    adequately, and funds have been expended, not for business

10   sources.

11        So what Ms. Allergan is doing right now with the

12   series of 1782s is that she is steadily obtaining records from

13   financial and accounting and now a law firm in order to trace

14   what domain names were bought, what domain names were sold, and

15   where the money went from those purchases and sales because she

16   knows that there is at least $3 million that should have come

17   to her that is missing and maybe more.

18        And her efforts have borne fruit.  In some of the

19   other documents that we have received, there has been evidence

20   of unusual accounting practices, mislabeled payments, wire

21   transfers that appear to be made to relatives of advisers to

22   Mr. Allergan.

23        So we have real verifiable, sober concerns about how

24   the money has been used.  And those concerns are also

25   compounded by Mr. Allergan's apparent -- well, his drug

1    problems which give rise to concerns that he may not be

2    completely in control of his own decision-making.

3              THE COURT:  All right.

4              MR. WILSON:  The third question that you had raised,

5    your Honor, is whether or not the scope of the application is

6    reasonable.  We have advanced several arguments on that matter.

7              The three that I'll highlight for the Court are to the

8    extent that some of the documents that are not privileged at

9    all, whether those are that privileged come within the

10   fiduciary exception, and whether privilege has been waived by

11   the failure to provide a privilege log.  Then finally, we've

12   also provided a revised subpoena as a proposal in the event

13   that the Court continues to have any concerns about the scope.

14             So with respect to the first category, if we start

15   with the 7,000 documents that are potentially responsive that

16   Akin Gump has noted, given the nature of the documents that

17   we're seeking, our presumption is that many of them, perhaps

18   most of them, are in the nature of documents with

19   counterparties that are purchasing and selling these domain

20   names which presumptively would not be privileged.

21             Then there would be certain accounting and banking

22   records which also would not involve the provision of legal

23   advice.  So just as a threshold matter, it would seem that

24   providing those documents would not be unduly burdensome.

25             Then comes the question of a privilege review for any

1    documents where Akin Gump perceives that there is a privilege.

2    In this case, I think the fact that Shareefah is a 50 percent

3    owner of this corporation and presumptively, to the extent that

4    Akin Gump was acting on behalf of FMA -- and there is some

5    ambiguity in the papers now as to whether they were acting for

6    Thunayan in his personal capacity or for him in his corporate

7    capacity, but certainly for those tasks that Akin Gump has

8    undertaken on behalf of the corporation, Shareefah is a natural

9    applicant to fall within this fiduciary exception.

10            To show good cause to fall within the exception, there

11    is a multi-prong test, a non-exhaustive test.  We recited about

12    nine prongs of this in our opening papers.  Akin focused on

13    three, albeit acknowledging that they weren't giving a

14    full-throated analysis in their papers.

15            But the three prongs that they did focus on were

16    whether she had colorable claims in the BVI proceeding;

17    secondly, whether discovery was readily available through

18    alternate sources; and third, whether petitioner, as we were

19    discussing before, is blindly fishing.

20            So I think those three prongs map on to arguments that

21    I've already addressed so far today in that the colorable

22    claims she has in the BVI proceedings are claims for control of

23    FMA and for the waste of corporate assets.

24            In terms of the discovery being readily available

25    through alternate sources, I think ultimately the other roads

17

1    that Akin has presented all lead back to Akin.  Those are where

2    the documents are.  So to the extent that it's forcing

3    Ms. Allergan to appoint a receiver and then come back to them

4    or go to her brother, I think the road always leads back to

5    Akin.

6          THE COURT:  This is a question that is really in

7    Mr. Wohl's bailiwick, but I'm going to ask you because you may

8    have some information on the subject.

9          What is your understanding of the circumstances that

10   occasion Akin Gump to have these documents?  I understand

11   they've done work for FMA, but it would not, in the ordinary

12   course of most representations, cause a law firm to have

13   banking records of its client and the level of detail which you

14   seem to be seeking.

15         I don't understand them to be disputing the general

16   concept that they have responsive documents.  They've urged

17   that it's burdensome to produce them.

18         What is your version of the answer to that question?

19         MR. WILSON:  Well, your Honor, first of all, with the

20   caveat that you're right, this is something which is not in my

21   personal knowledge, but drawing inferences from the other

22   documents that we've been able to obtain and conversations with

23   other parties, it's our understanding that in this four-year

24   period, Thunayan, who is an individual, sought the advice of

25   Akin to effectively help him manage the business.

1          I don't know what the core activities were of Akin.

2     Perhaps the obvious legal activities would be the purchase and

3     sale deal work involving the inventory, but I do understand

4     that Akin was involved in retaining WithumSmith, which was the

5     accounting firm, and tasking WithumSmith with the scope of

6     their accounting work.  So there may be back-and-forth with

7     Withum over what that work is.

8          There have been several accounts, bank accounts, set

9     up at banks in New York and in the United States that Akin Gump

10    was involved in setting up the bank accounts.  We've seen that

11    some of the signatories to some of these accounts include

12    individuals who were formerly employed by Akin Gump.

13         Somewhat inexplicably, there are a series of payments

14    that have been made to a former employee of Akin Gump and that

15    person's daughter.  So there seems to be a fairly intimate

16    relationship of moving of monies sort of both to people who are

17    affiliated with Akin Gump that are not 100 percent explained by

18    the retainer agreement because it's an individual with

19    signatory authority.

20         We've also seen checks with the same address as the

21    bank account set up by Akin Gump that are dispensing funds with

22    the name of FMA and also the name of the individual who has

23    signatory authority and the name of what appears to be a shell

24    company that was set up by that Akin Gump former employee.  So

25    there is some complexity around what the work was that was

1   being done by Akin Gump and what the work was that was being

2   done by Akin Gump employees.

3           THE COURT:  All right.

4           MR. WILSON:  Your Honor, in terms of the fiduciary

5   exception, our submission is that Ms. Allergan fits naturally

6   within that exception and Akin has not really put forward a

7   very robust opposition to that position.

8           The third point that we had made about waiver is

9   really -- I think the most significant case on that point is

10  the third *Chevron* case that we cited.  I believe we cited it

11  first in our reply papers.  It's 749 F.Supp.2d 170.  That was

12  the third in a line of cases where Judge Kaplan ordered the

13  waiver of attorney-client privilege from Steven Donziger.

14          I think the touchstones from that case are that first

15  that there is a presumption that we have a privilege log in

16  order to facilitate the kind of conversation that we're having

17  today, and it's incumbent on the recipient under local

18  Rule 26.2(c) to either provide such a log or seek an

19  application for more time or seek a protective order, none of

20  which has happened here.

21          I think the circumstances in which courts order

22  waivers are where the failure to provide the privilege log is

23  used as a sword.  To the extent that Akin Gump is arguing that

24  no subpoena should issue because it's unduly burdensome but on

25  the other hand they haven't provided any evidence of even the

1   categories of privilege, it makes it difficult for, I believe,

2   them to stand on privilege as a grounds for denying the

3   subpoena.

4          With that, your Honor, I think I would conclude by

5   saying that for these reasons, our view is that the eight

6   requests that we made in the original subpoena are sufficiently

7   tailored; that 7,000 documents in a commercial case that

8   involves the sale of $24 million in assets is not inherently

9   unduly burdensome.

10          THE COURT:  I think I have your argument.

11          MR. WILSON:  Thank you, your Honor.

12          THE COURT:  Mr. Wohl.

13          MR. WOHL:  Thank you, your Honor.

14          Our view, your Honor, is that Akin Gump is put in a

15   difficult and unfair position here, as is the Court, by the

16   applicant seeking to come to Akin Gump as almost but not quite

17   the first stop on this discovery effort.

18          What should happen in this situation, we would submit,

19   is -- and the answer to one of your Honor's questions -- that

20   you can see from the pleadings in the BVI that Mr. Alghanim is

21   indeed a party to the BVI proceedings and that FMA itself is a

22   party to the BVI proceedings.

23          So what should happen in the ordinary course, we would

24   submit, is that if Ms. Alghanim had a claim to make of any of

25   the varieties that she's sort of hinted at in these proceedings

1    but has never really said, I definitely want to make this

2    claim, what she should do is bring that claim to the BVI court

3    where she claims that she already has some kind of proceeding

4    pending, assert whatever that claim is.  If there is a receiver

5    appointed, there's a receiver appointed.  The receiver then

6    asks Akin for any materials that the company would be entitled

7    to.

8            They also requested provisional liquidators to be

9    appointed down in the BVI.  That was denied when they sought a

10   winding up of the company.  If there were provisional

11   liquidators appointed or permanent liquidators appointed, then

12   they could make a request to Akin, and there would be no

13   privilege issues.  There would be no confidentiality issues at

14   all.  It would be a very simple, regular process.

15           Or if Mr. Alghanim were a party to the BVI proceeding

16   or appeared in the BVI proceedings, then -- he already is a

17   party -- he could make the request to Akin.

18           And, again, there wouldn't be any privilege issues.

19   There wouldn't be any complexity to it.  Whatever documents

20   belong to FMA could be shipped to the proceedings in the BVI,

21   and it would be an altogether simple process.  Akin would not

22   be required to engage in any kind of concerns about Rule 1.6

23   confidentiality obligations.  It wouldn't be obligated to have

24   any issues with respect to privilege either.

25           THE COURT:  The problem is if we were writing on a

1    blank slate as to what does use in a foreign proceeding mean as

2    written into 1782, it would be a most reasonable argument that

3    you've presented.  But it would require undoing quite a lot of

4    case law, including *Intel* itself.  It's settled law that there

5    need not be a proceeding as long as it's reasonably

6    contemplated.

7         So to say, which I perfectly understand -- and maybe

8    if I were sitting around a table drafting a statute, you might

9    have a sympathetic ear -- go file the proceeding.  Go ask the

10   court for the documents.

11        And in fact, maybe in my version of the statute, if

12   the court wants some help, the foreign court wants some help,

13   all they need to do is say, please help, and the U.S. court

14   will help.  That's not 1782, and that's not the jurisprudence

15   under it however, as you know.

16        MR. WOHL:  I understand exactly what your Honor is

17   saying, but I would respectfully suggest that this case falls

18   outside a case where there is a proceeding pending or

19   reasonably contemplated.

20        Let's look at what has gone on so far in the BVI, and

21   let's look at the suggestions of what Ms. Alghanim thinks that

22   she might be interested in.  First of all, there was a

23   receivership created down there.  That receivership is over

24   with because the receiver resigned.

25        By the way, it was an extremely narrow receivership as

1    you can see in our papers.  That receiver has resigned.  That's

2    over with.

3            In addition, there was an application for the winding

4    up of the company, which under the circumstances that

5    Mr. Wilson has described would seem like a claim that one might

6    make.

7            That was heard at a hearing in December of 2014, and

8    that was denied.  In addition, at the time of the denial, the

9    judge made a number of observations that seemed to throw a good

10   deal of cold water on the kinds of claims that Mr. Wilson is

11   now making.

12           He did not find that Mr. Alghanim was incapable of

13   running the company.  He rejected the claim that Ms. Alghanim,

14   the sister, is entitled to information.  He said, she's not

15   entitled to the information she wants as a shareholder.  He

16   said that she just seems to be trying to interfere with the

17   management of the company.

18           THE COURT:  This is 2015?

19           MR. WOHL:  This is 2014, December of 2014.  And the

20   judgment was issued I believe in January of 2015.

21           THE COURT:  I agree with you there are certain

22   disadvantages to the petitioner trying to ride two horses here

23   of there's a proceeding pending and there's a proceeding

24   reasonably contemplated.  Trying to ride them at the same time

25   doesn't work all that well.

1          I'm not sure I understand the argument as to a

2     reasonably contemplated proceeding.

3          MR. WOHL:  All right.  Let's look at what the

4     petitioner's papers indicate.  What are their complaints.  She

5     complained that she advanced money to the company and it hasn't

6     been repaid.  She talked about at some point that Mr. Alghanim

7     isn't really capable of running the company, a claim that, in

8     2014 anyway, the judge in the BVI rejected.

9          She claimed that she wants a disclosure of domain

10    names.  She says she wants a distribution of assets.  She says

11    there is $9 million that she's received.  She thinks she's

12    entitled to another $3 million.

13         Does she say that she wants to bring a claim for

14    repayment of the loan?  No.  Does she say that she believes

15    that she's entitled to dividends or a distribution of assets of

16    the corporation?  No.  She doesn't say that.  She just says

17    she's unhappy that she didn't get more money.

18         THE COURT:  Well, certainly, as described in the

19    courtroom this afternoon, I grant you there may be something of

20    a gap in the way things are described, but as described here

21    today, it seems to be a claim of dissipation and perhaps

22    conversion of assets which is a rather serious charge.

23         MR. WOHL:  That is a serious charge, your Honor.  And

24    there is no reason why, if she wanted to assert that in the

25    BVI, she couldn't assert it.  Indeed, the expert affidavit that

 1    she provides has the attorney, the BVI attorney down there,

 2    saying, if she wanted to bring a claim, she could bring it

 3    under the same index number that she has already acquired down

 4    there.

 5          Does that really sound like it's within reasonable

 6    contemplation, if she wanted to bring a claim?  She doesn't

 7    even say, I have a claim, and this is what the claim is.  She

 8    instead has the lawyer saying, if she wanted to bring a claim,

 9    and then she has other assertions in her papers that seem quite

10    like a fishing expedition.

11          She says she wants to get material to shed light on

12    the accounts and transactions undertaken for the benefit of

13    FMA.  She wants to determine the quantum and location of funds.

14    She says -- this was another statement -- she may be required

15    to pursue other requested remedies.

16          Then the attorney says, in the event that the claimant

17    seeks further relief, then she could bring it under that index

18    number.  So I think these are assertions that have a good deal

19    more vagueness, I would submit to your Honor, than the kinds of

20    cases like *Intel* and the Cravath cases which we're all familiar

21    with.

22          In those cases, there was usually a complaint had been

23    drafted, or there was a specific assertion of this is my claim.

24    That's not what we have here.  We have somebody engaging in

25    what looks much more like some kind of an investigation and not

1    an engagement of an attorney to bring a specific claim or even

2    an assertion of a specific claim.

3        And that makes it very difficult for the Court --

4    for example, just sort of skipping ahead a little bit,

5    Mr. Wilson refers to the fiduciary exception and says, well,

6    are there colorable claims.

7        The question is what is the claim.  Is the claim for

8    distribution of assets?  Is the claim for a winding up of the

9    company?  Is the claim for a repayment of the loan?  I think in

10    his papers, the reply papers, they refer to questionable

11    transactions.  What transactions are they?

12        It seems to me it makes it very difficult for the

13    Court to evaluate whether there is a claim under reasonable

14    contemplation in these circumstances.  And I would point out

15    that, as I understand it, the cases indicate that it's not just

16    a claim that has to be in reasonable contemplation.  It's the

17    disposition that has to be in reasonable contemplation.

18        Certainly it's very unclear here whether she wants to

19    go back to BVI and try to get a winding up of this company.

20    Does she want to take over the company?  Exactly what does she

21    want to do?  I think that there is a vagueness there that is

22    far beyond what is normally involved in these 1782

23    applications.

24        As sort of a related point, that's what I would

25    describe as the statutory shortfall where I think it is

1    doubtful that they actually meet the statutory requirement, but

2    where they clearly fail, it seems to me, is under the first

3    discretionary requirement which is where the courts have

4    indicated that if the subject of the discovery is a party in

5    the foreign proceeding, then, as the courts have said -- I

6    believe *Intel* and the Second Circuit have said that there is

7    less need for 1782 intervention.

8            And that is certainly the case here because, as all

9    the captions indicate on these various orders, the parties to

10   that BVI proceeding, whether it's alive, dead, whatever status

11   it's in, are Ms. Alghanim, Mr. Alghanim, and FMA.

12           THE COURT:  What's urged here, of course, is that

13   since Thunayan has gone radio silent in recent months, the

14   whole underpinning of the first *Intel* factor really becomes

15   greatly weakened because this individual is not available to

16   obtain documents from.

17           He's gone is the assertion.  Your client can't find

18   him.  If that's the case, he may be someone who can, in

19   principle, be named as a party but not necessarily a person

20   from whom documents can be obtained.

21           Are you representing that these documents that are in

22   the possession of Akin Gump exist in the BVI?

23           MR. WOHL:  No.  I'm not representing that.  I don't

24   know what's in the BVI.  What I am suggesting, because I'm not

25   a BVI lawyer, but it would seem to me -- I have seen, and I

1    believe we put in our papers -- that in the BVI proceeding,

2    Mr. Alghanim, I believe, submitted an answer.  So he appeared

3    in that proceeding.  I think it was in 2014, but I'm not sure.

4            THE COURT:  I don't blame you one iota for seizing

5    upon the fact that the petitioners are trying to ride those two

6    horses, and there are distinct disadvantages to trying to do

7    that.  He was a party to the first proceeding, if you will, and

8    was there and answered.  I take your point.  It's a very fair

9    point.

10           Except it's also fair that you point out that those

11   proceedings are stale.  It may be technically an open case, but

12   there's nothing going on in them.  That's also a fair point

13   which turns the mind towards a reasonably contemplated

14   proceeding.

15           I understand it, but there is a limit to how far it

16   goes if there is no assurance that these documents are present

17   in the BVI and no assurance that this individual can be found

18   today such as to direct or order the production of the

19   documents.

20           MR. WOHL:  Well, I would think, your Honor, that if

21   the proceeding were continued in the BVI and Ms. Alghanim

22   sought relief there, as her expert says, if she were to seek

23   relief -- she would seek it under that what we would call an

24   index number -- it would seem to me that the BVI has to have a

25   process by which if the company which is sought to be either

1    wound up or put into receivership doesn't appear and the sole

2    director doesn't appear, I would think that there must be some

3    form of relief that the BVI court could order.

4         It would seem to me very likely it would be a receiver

5    or a liquidator, and the receiver or the liquidator, if the

6    documents aren't in the BVI -- and I have no idea whether there

7    is anything in the BVI other than court, whatever, but it would

8    be quite easy for them to contact Akin and say, we're the

9    authorized representative of this company.  They are your

10   former client.  We want our documents.

11        I would imagine that Akin would just turn them over,

12   but they wouldn't have these confidentiality issues, and they

13   wouldn't have the privilege issues.  It seems to me that that

14   is a fairly compelling consideration in this situation.

15        For the petitioner to say that they can't get the

16   documents through discovery in the BVI right now because there

17   is no active proceeding pending is really to turn the situation

18   on its head.

19        The reason that there is no active proceeding pending

20   is because Ms. Alghanim has not initiated a proceeding, and

21   indeed she hasn't even said what kind of proceeding it is she

22   would like to initiate.

23        And as our papers indicate and I think makes perfect

24   sense to the Court, the BVI lawyer whose affidavit we

25   submitted, if she were to do that, the next thing that would

1   happen is there would be some kind of a conference, there would

2   be discovery and disclosure orders issued, and that problem

3   would be resolved, as far as Akin is concerned.

4          Consequently, that's why we think that 1782 is really

5   not the process that should be engaged in here, and the fact

6   that Mr. Alghanim is difficult to locate should not be a

7   serious obstacle to the enforcement by a BVI court over a BVI

8   corporation.

9          And the issue of what the law is under the BVI and

10  whether Ms. Alghanim is entitled to distributions, she's

11  entitled to information -- all those issues of BVI law could

12  easily be dealt with by a BVI court, including their

13  entitlement to information.

14         THE COURT:  Now talk to me about the invasiveness and

15  the burdensomeness of this.  Specifically the first thing that

16  comes to mind is looking at the narrowed subpoena, I can

17  certainly see where, as drafted, there could be privileged

18  materials.

19         All documents, for example, in category 5, including

20  invoices and emails concerning transactions for the sale of

21  assets of FMA, Inc.  Well, if Akin Gump represented FMA on the

22  sale of assets, I could conceive there would be privileged

23  documents there.

24         But there are other categories where it would not

25  appear to be the case that there would be a privilege that

1    would attach such as category 2, documents sufficient to show

2    all persons or authorized signatories for any bank accounts

3    held by FMA, FMA LLC, or related companies, or all invoices for

4    FMA, or for that matter, all bank transactions or credit card

5    transactions.

6             I don't know how much of this Akin Gump has, but I

7    don't see where there would be any burden of privilege review

8    as to categories such as that.

9             MR. WOHL:  I certainly agree with your Honor that the

10   narrowing of the subpoena vastly reduces the privilege issues.

11   No question about that.  It doesn't totally solve the problem

12   from Akin's point of view because the proceedings that have

13   occurred so far certainly indicate that FMA opposes giving

14   information to Ms. Alghanim that she's not entitled to.

15            And indeed, the judge in the BVI said that as a

16   shareholder she was not entitled to the information that she

17   was requesting in that proceeding, and consequently, Akin is

18   not in a position to just voluntarily give up the material of

19   its former client.

20            THE COURT:  I perfectly understand that.  That's why

21   they need to be here in this courtroom, and it's a perfectly

22   reasonable thing for them to do.  It would be surprising -- it

23   may raise a host of other issues -- if they did not press the

24   issue.  So I perfectly understand that.

25            Now, is there a log that Akin Gump has prepared

1   pursuant to the local rule in response to a subpoena served on

2   it?

3           MR. WOHL:  We have not done that, your Honor, because

4   it was our view that there were these threshold issues and that

5   indeed part of the burden of the 1782 subpoena would have been,

6   when the subpoena first came in, to log these approximately

7   7,000 documents.

8           The effort would be much smaller now because of the

9   fact that the subpoena has been narrowed.

10          THE COURT:  Let me ask you this:  The 7,000 number is

11  the number that relates to the original subpoena, not the

12  narrowed subpoena?

13          MR. WOHL:  Correct, your Honor.

14          THE COURT:  Do you happen to know the number that

15  relates to the narrowed subpoena?

16          MR. WOHL:  I'm not sure exactly what this number

17  means.  We've talked about a number of around 3,000.  I have to

18  say I'm not sure exactly what that includes, but it's sort of

19  indicative of the fact that the narrowing of the subpoena very

20  substantially reduces the privilege issue, and I certainly want

21  to make it clear to the Court that that is the case.

22          Even the narrowed subpoena, however, does raise a

23  number of issues in the sense that they ask for the documents

24  relating to any escrow account related to FMA.

25          It seems to me -- I'm not sure why it would be --

1    let's put it this way:  Those are not the same kinds of

2    documents that are in invoices and things of that sort.

3              In number 4, there is sort of an interpretation issue

4    of documents related to expenses using funds from FMA, Inc.

5    that are not direct expenses of FMA, Inc.

6              Then in number 3, they don't just say checks, bank

7    transactions, and credit card receipts.  They say details of

8    those.  I'm not sure exactly what that means.

9              THE COURT:  I take your point on 3 and 4.

10             Go ahead.

11             MR. WOHL:  Then one other thing is that I believe in

12   their reply papers, the petitioner said that she was

13   eliminating everything related to FMA LLC or related companies,

14   and now it appears again in request number 2.  I don't know

15   whether that's a mistake or if that was intended.

16             As I said, the privilege issue is certainly

17   substantially reduced.  The confidentiality issue is not

18   eliminated because we have the impression that the former

19   client of Akin does not want to voluntarily release this

20   information.

21             I think that's all I have, your Honor.

22             THE COURT:  Thank you, Mr. Wohl.

23             Mr. Wilson, why don't you begin, if you will, with

24   regard to categories 3 and 4 of the narrowed subpoenas.

25             MR. WILSON:  Your Honor, turning to category 3,

34

1   details of all checks, etc., my understanding is that from

2   looking at the other side of this, from some of the production

3   from the banks, that there are certain transactions that

4   Ms. Alghanim is aware of, that a check amount was sent.

5          But to the extent that Akin has related information,

6   whether it is a canceled check that has a notation or any other

7   documentation that relates to that transaction, that we want to

8   capture that small penumbra around the check and not just get

9   what we have in circumstances already, just a line item that

10  this amount of money went.

11         THE COURT:  I don't know that that does it in any

12  event.  It may be that if you got all checks, bank

13  transactions, credit card, debit cards, and statements

14  concerning -- not concerning FMA.  I guess it would be of FMA,

15  wouldn't it?

16         MR. WILSON:  Yes.

17         THE COURT:  "Concerning" is a word defined in courts'

18  local rules.  So I will leave it alone.

19         MR. WILSON:  Yes, your Honor.

20         THE COURT:  It seems to me that your challenge there

21  is the words "details of."

22         Let me hear with regard to paragraph 4.

23         MR. WILSON:  Your Honor, we've seen a number of

24  payments made to Akin Gump-related individuals and, as I

25  referenced earlier, companies, relatives.  They're not

1  obviously FMA expenses.  For example, I believe travel expenses

2  for the child or health expenses for the child of an Akin Gump

3  employee.

4         THE COURT:  I got your point on that.  You may be

5  entitled to some relief in terms of discovery, but the way 4 is

6  written, it puts the lawyer in a position of being a judge of

7  the actions of his former client.

8         MR. WILSON:  Your Honor, we would be happy to

9  eliminate that phrase and end the request with FMA, Inc.  The

10  effort to put that phrase in is just our good-faith attempt to

11  try to further narrow it, but I certainly think that documents

12  concerning payments for expenses using funds from FMA, Inc. is

13  relatively precise in and of itself and doesn't need that

14  qualifier.

15         THE COURT:  Let me inquire further.

16         What is captured in the words "for expenses"?  Why

17  isn't what you're seeking documents concerning any payments

18  from FMA, Inc.?

19         MR. WILSON:  Even better, your Honor.

20         THE COURT:  It's not a question of whether it's better

21  but the question of when you include the words "for expenses,"

22  what does that capture?  When you look at all the payments, and

23  then there's the word "expenses," what is the reader of the

24  subpoena supposed to be doing at that point?

25         MR. WILSON:  Well, your Honor, the reason I said "even

1    better" is I think the Court's permutation is broader and

2    captures a wider range of materials, and I think that that is

3    certainly satisfactory to us.  The reason for including

4    "expenses" is it seems it's a subset of payments.

5            But given what we're talking about here in terms of

6    the scope of the request, I think it's clearer and slightly

7    broader but not that much broader to just eliminate "expenses"

8    as well.

9            THE COURT:  Anything else you wanted to comment on on

10   Mr. Wohl's presentation?

11           MR. WILSON:  Just briefly, your Honor, I would say

12   that generally with respect to the applicability of 1782 to

13   these circumstances, I would just turn the Court back to the *In*

14   *re Kiobel* case from 2017.  I think that's pretty closely on all

15   fours with us here, a contemplated proceeding against Cravath.

16           In terms of the precision with which Ms. Alghanim has

17   articulated her contemplated claim, I think that most directly

18   it's for recovery of the $3 million in lost assets and

19   ultimately the control of the company and potentially also

20   breach of fiduciary duty claims.

21           But I also think there is a balance to be struck here

22   where she doesn't have to telegraph attorney work product in

23   terms of all of the claims she's anticipating to bring, but

24   she's provided for sufficient specificity to allow for a

25   narrowed subpoena and a targeted request, and I think we have

1    that here.

2              The last thing I would say with regard to

3    confidentiality -- and I didn't mention this in my opening

4    remarks -- is our understanding of both Rule 1.6 and also the

5    language in the materials that that Akin has represented it provided

6    to Mr. Thunayan, although they did not provider a retainer

7    agreement that showed it was provided to him, but both of those

8    documents provide for an exception where there is court-ordered

9    production.

10             I understand that we are here today so that there is

11   no ambiguity about the voluntariness of the production, but I

12   don't see 1.6 as a barrier to the Court ordering the subpoena.

13   Thank you.

14             THE COURT:  Thank you all very much.  I'll try and get

15   something out relatively quickly on this.  Thank you for the

16   very fine presentations.

17             MR. WILSON:  Thank you, your Honor.

18             MR. WOHL:  Thank you, your Honor.

19             (Adjourned)

20

21

22

23

24

25